FILED

2016 SEP -9 A 11: 49

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, RONALD KNOBLOCK, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:16CV1153-AJT-JFA |
| INFOZEN, LLC., formerly InfoZen, Inc., IDENTRIX, LLC, and RAJ ANANTHANPILLAI, | ) ) ) ) ) ) | COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, AND DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |

**FILED IN CAMERA AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**DO NOT ENTER ON PACER**

**DO NOT PLACE IN PRESS BOX**

## **T**HE **N**ATURE OF THE **C**ASE

1.  Plaintiff-Relator Ronald Knoblock (hereinafter the "Relator"), acting on behalf of the United States of America, brings this *qui tam* action to recover damages and civil penalties against the Defendants, InfoZen, LLC, IDentrix, LLC, and Raj Ananthanpillai, for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

2.  The Defendants provide information technology services to various government agencies. The Defendants have violated the False Claims Act by classically corrupt contracting practices. The centerpiece of the Defendants pattern of false claims is their development of their crown jewel software program by employing what may be rightfully characterized as the oldest trick in the book: they hid the costs of their commercial activity unrelated to their federal contracting in the rates that they charged to cost-plus contracts.

3.  After improperly charging the costs of those development efforts to government cost-plus contracts that Defendant InfoZen, LLC has with various components of the United States Department of Homeland Security ("DHS"), Defendants then launched a commercial company to sell that software (that is, a product of the Defendant, IDentrix, LLC) to the private sector.

4.  From early on in his tenure at InfoZen as Vice President of Contracts and Compliance, and continuing several times throughout that tenure, the Relator raised questions about InfoZen's practice of charging the costs of this software development to InfoZen's DHS cost-plus contracts, only to have his inquiries so forcefully rebuffed and his access to information so firmly foreclosed that he soon recognized that Defendant Ananthanpillai and others on the InfoZen executive team did not want him to fulfill a serious contract compliance role and that his job would be in jeopardy if he did so. Seeing no steps he could take to change this state of

2

affairs, and fearing reprisal if he made the attempt, the Relator began to look for another job, disappointing his hopes that he would have a long-term career at InfoZen.

5. Mr. Knoblock eventually left the company voluntarily and without finding any other employment position because he could no longer abide Defendants' corrupt practices.

6. The costs of the development of the IDentrix software and the commercial company to market it was unlawfully charged to InfoZen's DHS government contracts from approximately 2007 through 2014 and into 2015 when the Defendant, the newly formed IDentrix LLC, was launched and became the vehicle by which the IDentrix software is marketed and sold to commercial customers.

7. InfoZen got away with these false claims through improper charging practices, and was able to evade detection in part because InfoZen's government contracts have not been audited for over 10 years. The InfoZen accounting system was determined to be only "adequate," by the Defense Contract Audit Agency ("DCAA") in 2006. InfoZen's accounting system never received an "acceptable" rating through the Relator's tenure. The "Disclosure Statement" required by the Federal Acquisition Regulations (the "FAR") – formally documenting and disclosing a contractor's cost accounting practices – was not submitted by InfoZen until 2012.

8. InfoZen was very much aware of the well-documented fact that DCAA was overwhelmed, and focusing its stretched resources on auditing contractors with the Department of Defense and its components rather than on auditing contractors with civil agencies such as DHS. So as not to raise a flag to Contracting Officers that might trigger an audit, InfoZen was very careful not to overrun their cost-plus contracts. InfoZen was able to achieve this, and yet improperly charge the costs at issue in this case to the Government, in part because InfoZen was not able to fill positions on contracts and was as many as 7 to 10 positions short in performing

one of its largest cost-plus contracts with the Transportation Security Administration ("TSA") of DHS. As a result, InfoZen did not exceed its estimated costs, and the improper IDentrix software development charges were camouflaged. In short, the Defendants designed and developed a valuable software asset and established a commercial company to market it on the taxpayer's dime – or, more correctly, the taxpayer's millions of dimes.

9. In addition, consistent with its disregard for compliance with the law governing government contracting, Defendant InfoZen overcharged the United States Patent and Trademark Office ("USPTO") in the performance of a computer maintenance contract by invoicing higher offsite rates for its personnel after they had be relocated onsite at the USPTO.

## **THE PARTIES**

10. The United States is the real party in interest to the claims made in this Complaint.

11. Ronald Knoblock is the *Qui Tam* Plaintiff/Relator in this action and a resident of Rockville, Maryland. He was employed at InfoZen from December 2011 through December 2014 as Vice President of Contracts and Compliance. The Relator was an at-will employee of InfoZen.

12. InfoZen, LLC ("InfoZen") is a Maryland limited liability company with its principal place of business at 6700A Rockledge Drive, Suite 300, Bethesda, Maryland, 20817. InfoZen was originally incorporated as a Maryland corporation on August 31, 1995. InfoZen, Inc. was converted to InfoZen, LLC, a Maryland limited liability company, pursuant to Articles of Conversion filed October 5, 2015. Upon information and belief, at the time of its conversion, Raj Ananthanpillai was the sole shareholder of InfoZen, Inc. At bottom, InfoZen, LLC is simply the current manifestation of InfoZen, Inc. Consequently, the conduct of InfoZen, Inc. set out in this Complaint that violated the False Claims Act is attributable to InfoZen, LLC. All references

4

to "InfoZen" in the allegations of this Complaint refer to the company in whatever form it was operating at the time the facts alleged occurred.

13. Defendant InfoZen sells information technology management services and products to the Federal Government and others.

14. Defendant IDentrix, LLC ("IDentrix") is a Delaware limited liability company with its principal place of business at 6700A Rockledge Drive, Suite 300, Bethesda, Maryland, 20817. IDentrix was formed on October 11, 2013, and is a wholly owned subsidiary of InfoZen.

15. IDentrix is a company created by InfoZen as a spin-off to manage and market the the IDentrix software that InfoZen developed and patented, paid for by the unlawful funding through the false claims alleged in this Complaint.

16. Defendant Raj Ananthanpillai is a resident of Potomac, Maryland. Ananthanpillai is the key leader in this scheme. He has been and is the Chairman, Chief Executive Officer, and President of InfoZen in both its forms. Ananthanpillai is also the Chief Executive Officer of IDentrix.

17. The Defendants InfoZen and IDentrix are all owned, controlled, and operated by the Defendant Ananthanpillai, and are used by Ananthanpillai for the common purpose of advancing his commercial interests and personal wealth. As such, Defendants InfoZen and IDentrix are alter egos of one another such that they are jointly and severally liable for the actions of the other and for the wrongful conduct alleged in this Complaint.

## JURISDICTION AND VENUE

18. This action arises under the False Claims Act, 31 U.S.C §§ 3729 *et seq.*

19. This Court has subject-matter jurisdiction over this action under 31 U.S.C §§ 3732(a) and 3730(b), and 28 U.S.C. §§ 1331 and 1345.

20. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a). Moreover, the Defendants have transacted business in the Eastern District of Virginia.

21. Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because the Defendants can be found and transact business in this District and a substantial part of the events or omissions giving rise to Relator's claims occurred in this District.

22. Under 31 U.S.C. § 3730(e), there as been no statutorily relevant public disclosure of the allegations or transactions set out in this Complaint.

## FACTUAL ALLEGATIONS

### A. The USPTO Contract.

23. In the USPTO Contract (Contract No. GS-06F-0631Z; Task Order DOC4PAPT1000008) InfoZen was the prime contractor providing "Informational Technology Product Assurance Services" to the USPTO. The contract had a one-year base with nine option years, running from March 2010 to February 2020. The estimated value of the contract over the full 10 years was approximately $22.2 million.

### B. The DHS Contracts.

24. Three contracts with components of DHS were unlawfully charged for the development of the IDentrix software and the company to market it. The longest running contract that was one target of the Defendants' false claims is the over $170 million InfoZen prime contract with the TSA named "Transportation Threat Assessment and Credentialing" ("TTAC"). The initial TTAC contract ran from April 2006 to December 2014 (Contract No. HSTS02-06-D-TTC028). InfoZen received a new award as prime contractor beginning in 2015 (Contract No. HSTS02-12-R-TTC701).

25. InfoZen is the prime contractor for the TTAC contract, managing a team of 6 to 8 large and small business subcontractors. The TTAC contract is a cost-plus-fixed-fee contract. The services provided under this contract are operations and maintenance of TSA information technology systems, applications, and the related infrastructures. As part of delivering services under this contract, InfoZen deployed its Rapid Adjudicator risk management platform under the name Consolidated Screening Gateway to aid in screening and credentialing people, and to detect fraud in applications for various credentials.

26. The second contract involved in the Defendants' false claim scheme is a $98 million InfoZen contract with the Immigration and Customs Enforcement ("ICE") component of DHS named Engineering and Support Services ("ESS"). The ESS contract runs from September 2011 to July 2016 (originally Contract No. HSCETE-11-F-00006, converted to No. HSCETE-13-F-00041 in 2013).

27. InfoZen is the prime contractor for the ESS contract, pursuant to which it provides engineering, network design and implementation, and program management support for ICE's information technology infrastructure. The ESS contract is a cost-plus-award-fee contract.

28. The third contract involved in Defendants' false claims is a $12 million InfoZen contract with DHS's U.S. Citizenship and Immigration Services ("USCIS") named Transformation Integration and Configuration Services ("TICS"). The TICS contract runs from February 2014 to February 2017 (Contract No. HSSCCG-14-F-00043).

29. InfoZen is the prime contractor for the TICS contract, pursuant to which it provides support to the efforts of USCIS to computerize immigration processes and paperwork, specifically to develop and deploy a new version of USCIS's online portal (the Electronic Immigration System or ELIS) by replacing old code, workflow, and technology through

continuous integration/continuous delivery services. The TICS contract is a cost-plus-fixed-fee contract.

### C. The IDentrix Software

30. The costs that InfoZen unlawfully charged to the Government through the three cost-plus contracts described above arose from the development of the third generation of InfoZen's Rapid Adjudicator software. As its name suggests, Rapid Adjudicator is a suite of web-based tools designed, as part of a "screening gateway," to increase the speed and efficiency by which applications for certain credentials are processed, or "adjudicated."

31. According to InfoZen, Rapid Adjudicator "accepts personal information and other related data as part of the application for credentials with national security sensitivity and related significance. From this information, it then generates requests to external data sources and receives *biographic and biometric* results that are aggregated with the other applicant data. The system scores these data and, when the business rules warrant, passes the cases to adjudicators who evaluate the application and determine what business rules to apply."

32. On information and belief, the first generation of Rapid Adjudicator was deployed in 2005, for example, as part of the screening of commercially licensed drivers for credentials to transport hazardous materials, as part of background checks of frequent travelers for credentials entitling them to expedited airport security screening, and the evaluation of transportation workers whose jobs required unescorted access to secure areas of transportation facilities.

33. Rapid Adjudicator 2.0, released in 2006, was an enhanced version of its first generation, but still performed the same task of "screening gateway," supporting the threshold adjudication of applications for various credentials. The third generation of Rapid Adjudicator,

what was ultimately renamed IDentrix, tackled a broader task, what InfoZen called "credential lifecycle management."

34. IDentrix is designed to implement continuous risk management, which, as InfoZen puts it, "extends the value of a pre-hire background check throughout the entire employment lifecycle, using sophisticated analytics to continuously assess risk factors from all relevant criminal, financial and professional data sources to keep the risk profile current." Or, as Defendant IDentrix's website explains, "IDentrix is a cloud-based application that alerts you to critical changes in an individual's background when they occur so an organization doesn't have to wait until the individual self-reports or until the next randomly selected screen."

35. IDentrix was patented by InfoZen. Its "general availability" was announced on May 4, 2015. Defendant IDentrix became the arm of InfoZen by which the IDentrix software is commercially marketed some time later in 2015.

### D. The False Claims – the USPTO Contract

36. InfoZen's work for the USPTO contract began with its personnel housed offsite, and so InfoZen appropriately billed the USPTO at higher offsite rates.

37. In 2013, InfoZen moved its personnel onsite in the USPTO facility in Alexandria, Virginia. However, instead of changing to lower onsite rates at that point, InfoZen continued to bill at the higher offsite rates from April 2013 to September 2013.

38. USPTO officials became aware of the overcharging in late 2013, and demanded a refund of the overcharges.

39. Ms. Sylvia VanDyke, the head of IT Contracting at the USPTO, decided that the contract option for the following year would not be exercised, but the overcharges – approximately $250,000 – were never refunded at the direction of Defendant Ananthanpillai.

9

40. InfoZen's invoices for these overcharges from April 2013 to September 2013 constituted false claims.

### E. The False Claims – the DHS Contracts

41. During his first weeks at InfoZen in late December 2011 and the early months of 2012, the Relator, consistent with what he thought his responsibilities were as the new Vice President of Contracts and Compliance, devoted his time to getting to know the InfoZen team and trying to become familiar with the work being done on various contracts. As part of that effort, the Relator reviewed all of InfoZen's active government contracts.

42. One senior InfoZen executive that the Relator met was Aaron Kilinsky, nominally a Deputy Project Manager on the ICE ESS contract, but who, along with designated software developers, was spending a significant portion of their time on the IDentrix project. Indeed, through most of 2012, 2013 and all of 2014, Kilinsky spent the vast majority of his time, as a highly compensated executive, leading InfoZen's efforts to develop and market the IDentrix software.

43. However, the Relator had not seen any active contract that InfoZen had with the government that embraced the IDentrix project within its scope. Since the Relator did not have access to InfoZen's charge codes and related financial information (which were controlled by InfoZen's finance operation), he did not know how the costs of the IDentrix project were being charged and to whom.

44. Accordingly, the Relator asked Chief Financial Officer ("CFO") and Senior Vice President Dwight Carmichael, to whom the Relator reported, how the IDentrix costs were being handled. Carmichael advised the Relator that the IDentrix costs were charged to the government

as indirect costs, which means they were primarily allocated to each of the DHS cost-plus contracts.

45. The Relator immediately questioned Carmichael, asking if he was sure. Carmichael confirmed that this was how IDentrix was being handled, claiming that IDentrix was a research and development project, as if that point resolved the matter. The Relator nevertheless pressed his concern, based on his 35 years of government contracting experience, that he did not think that was the right way to handle the IDentrix costs, since there appeared to be no contract authorization for the development of the IDentrix software, and that effort amounted to a commercial undertaking. The Relator, through his training and experience, knew that mixing commercial business initiatives with government business was improper.

46. Over his tenure at InfoZen, the Relator and Carmichael had lunch together as often as two to three times per week. Sometimes InfoZen's comptroller, Richard Henschel, participated in these lunches. During these lunches, the Relator regularly brought up his concerns that the IDentrix costs were being charged improperly to the DHS cost-plus contracts in violation of the FAR.

47. Initially Carmichael, who, while having a general accounting background, had very little government contracts experience before joining InfoZen (about a year before the Relator joined the company), showed little outward uneasiness, but was open to discussion when Relator shared his concerns. Over time, however, Carmichael began to share the Relator's anxiety over the lawfulness of InfoZen's IDentrix charging practices. Carmichael then discussed the Relator's concerns with Ananthanpillai, but he rejected them out of hand and InfoZen's unlawful charging practices continued.

48. After driving back from one of their lunches in the latter part of 2014, Carmichael confessed to the Relator, "You and I are going to be long gone before these contracts are audited." The Relator and Carmichael often discussed during these lunches their efforts to leave InfoZen for other employment. The Relator left InfoZen in December 2014 and Carmichael left in early 2015.

49. By early to mid-2012, the Relator believed he had a clear enough understanding of InfoZen's operations – and had not yet budged Carmichael from his refusal to address the Relator's concerns about the IDentrix charges – so that he could raise his concerns at one of the Operations Meetings of InfoZen's executive team held every Monday and chaired by Defendant Ananthanpillai.

50. When the Relator did raise his concerns about InfoZen's charging practice for IDentrix's costs at an Operations Meeting, Ananthanpillai was clearly incensed that the Relator even raised a question about those charges. Ananthanpillai growled a hostile, conclusory reply with words to the effect that, that has already been covered; there's no problem with that; you shouldn't be concerned.

51. Notwithstanding the stonewalling the Relator faced on the IDentrix charges issue, he raised his concerns two more times, at Operations Meetings in 2013 and 2014, with no different result.

52. No one -- not Defendant Ananthanpillai, nor any employee or agent of the other Defendants, all of whom were under the control and direction of Defendant Ananthanpillai -- ever provided information to the Relator that explained how charging the IDentrix costs as indirect costs could be in compliance with the FAR. Closing off the Relator from such basic compliance information was fundamentally at odds with the Relator's supposed responsibilities

as Vice President of Contracts and Compliance. It soon became clear that the Relator's compliance function was not taken seriously by Ananthanpillai. The Relator's position was reduced to paper-pushing, with no effective compliance role.

53. Ananthanpillai insisted on personally maintaining control of every detail of InfoZen's activities, certainly following very closely the flow of money in and out of InfoZen. Ananthanpillai tracked InfoZen's expenditures in such detail that he dictated the specific coffees to be served in the office coffee machine. Given Ananthanpillai's tight control over all aspects of InfoZen's operations, it is not surprising that InfoZen never had a chief operating officer, much less an effective compliance officer, who could contradict his wishes. As his reply to the Relator concerning the IDentrix charges illustrated, Ananthanpillai was fully in command of InfoZen's charging practices with respect to the IDentrix costs.

54. It became clear to the Relator that if he tried to take more action on his concerns about the IDentrix charges, he would lose his job. Indeed, the Relator discovered that in joining InfoZen he had entered a dysfunctional business culture of internal wrangling and political maneuvering that caused executives to leave the company or be forced out. Between 2012 and early 2015 the entire executive team at InfoZen would be gone except for Ananthanpillai and his protégé, Manuel Miranda, the Senior Vice President for Operations and Steve Penyak, the Senior Vice President for Business Operations.

55. Over time, it also became clear that the Relator's position at InfoZen was untenable given the intransigence of Ananthanpillai and other senior executives at InfoZen concerning the charging practices for the IDentrix project, and he started discretely looking for a new job. At his age and salary level, however, the Relator found it more difficult to find a job than he had expected. Ultimately, the Relator reached the limits of his tolerance of the internal

pressures at InfoZen and the continued false claims being made concerning the IDentrix charges. The Relator left InfoZen in December 2014 without having a new job lined up.

56. Evidencing their knowledge that the charging practices InfoZen had followed with respect to the costs associated with developing the IDentrix software and the commercial enterprise by InfoZen would profit from that software were unlawful, both Kilinski and Carmichael made special efforts in December 2014 to let the Relator know that InfoZen was going to start charging the IDentrix costs against InfoZen profits, rather than to InfoZen's DHS cost-plus contracts.

57. Confirming that the IDentrix costs were not part of any work for which the Government had contracted, and that the Defendants and their key executives knew this, in 2013 representatives of InfoZen, led by Kilinsky, made a presentation to DHS and TSA officials to explain the new IDentrix software and related services, and to solicit a contract from the Government for that software and related services. DHS rejected that proposal.

58. By the time of the most intense activity on the development of IDentrix took place, in 2013-2014, six software product development technicians were spending 100 % of their time working on research and development for the IDentrix software.

59. In addition, the corporate team, the most highly compensated people at InfoZen, devoted 25 % to 100 % of their time (depending on the particular member of that team) on the commercial development and marketing of the IDentrix software. For example, the Relator spent up to one quarter of his time preparing or reviewing non-disclosure agreements, consulting agreements, and teaming agreements intended to advance the commercial activity by which InfoZen hoped to profit from the IDentrix software. Other senior members of the corporate team

spent even more time in the substantive work involved in preparing IDentrix for its commercial release.

60. The work InfoZen technicians and corporate executives to IDentrix was not within the scope of any contract InfoZen had with the Government. The efforts expended to develop the IDentrix software were neither sponsored by any government grant nor required in the performance of any government contract.

61. Instead, the InfoZen costs were falsely claimed by the Defendants to be indirect costs for which the Government was contractually responsible to pay by being charged to an overhead/general and administrative charge code, and then allocated to the three DHS cost-plus contracts described above.

62. On information and belief, the labor costs charged by the software product development technicians working on the research and development of the IDentrix software were improperly charged as indirect costs, first to the TTAC contract, and then also to the ESS and TICS contracts as they were awarded to InfoZen, approximately as follows:

| | |
|---|---|
| 2007-2010 | $200,000 per year |
| 2011 & 2012 | $300,000 per year |
| 2013 | $700,000 |
| 2014 | $1,000,000 |
| TOTAL | $3,100,000 |

63. On information and belief, all other costs associated with the commercial development of the IDentrix software, including time spent by the corporate team and the consultants hired by InfoZen, were charged to indirect costs billed to InfoZen's DHS cost-plus contracts. On information and belief, the Relator estimates those costs as approximately $1,000,000.

64. InfoZen submitted monthly invoices for the amounts it charged each of the DHS cost-plus contracts, each of which included false claims for the IDentrix costs. The Relator did not sign or otherwise have an opportunity to review those invoices.

65. At some point in 2015, the IDentrix software and related operations were transferred to the Defendant IDentrix. While a wholly-owned subsidiary of InfoZen (which in turn had become wholly-owned by Ananthanpillai), IDentrix maintains a separate website and all commercial and development operations related to the IDentrix software are now located in IDentrix, not InfoZen.

66. In early 2012, Ananthanpillai shared with the Relator and Carmichael that he had recently made a lot of money selling a commercial company. He explained that his "passion" was building and selling businesses, and making a lot of money as a result.

67. On information and belief, the creation of the Defendant IDentrix was a part of Ananthanpillai's plan as to how he was going to profit from the false claims to the Government by which the development of the IDentrix software and its commercial marketing was funded. By making IDentrix a commercial entity distinct from InfoZen, Ananthanpillai is now in a position, consistent with his "passion," to sell IDentrix, profit from that sale, and also continue to profit from the operations of InfoZen. On information and belief, Ananthanpillai is now looking for a buyer for IDentrix.

### CAUSE OF ACTION

#### COUNT I
*Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), in the Performance of the USPTO Contract*

68. The allegations in the foregoing paragraphs of this Complaint are incorporated here by reference.

69. This is a claim for treble damages, penalties, and other relief under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

70. By virtue of the acts described above, the Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the USPTO for the payment of labor costs represented as offsite labor costs when in fact those costs should have been billed as the cheaper onsite labor costs.

71. By virtue of the acts described above, the Defendants knowingly, or in deliberate ignorance or reckless disregard of the truth, made false statements to the Government to induce the Government to pay such false and fraudulent claims.

72. Each invoice the Defendants submitted for payment constituted a false claim and a false statement to get false or fraudulent claims paid by the Government.

73. The Government, unaware of the falsity of the statements and claims made by the Defendants, paid the claims that would not have been paid but for the Defendants' illegal conduct.

74. By reason of the Defendants' acts, the United States has been damaged in the amount of at least $250,000, or an amount to be determined at trial.

### COUNT II
*Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), in the Performance of the DHS Contracts*

75. The allegations in the foregoing paragraphs of this Complaint are incorporated here by reference.

76. This is a claim for treble damages, penalties, and other relief under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

77. By virtue of the acts described above, the Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment for the costs of work done to develop the IDentrix software .

78. By virtue of the acts described above, the Defendants knowingly, or in deliberate ignorance or reckless disregard of the truth, made false statements to the Government to induce the Government to pay such false and fraudulent claims.

79. Each invoice the Defendants submitted for payment constituted a false claim and a false statement to get false or fraudulent claims paid by the Government.

80. The Government, unaware of the falsity of the statements and claims made by the Defendants, paid the claims that would not have been paid but for the Defendants' illegal conduct.

81. By reason of the Defendants' acts, the United States has been damaged in a substantial amount to be determined at trial.

## **PRAYER FOR RELIEF**

Therefore, Relator, on behalf of the United States and on his own behalf, demands judgment against Defendants as follows:

a) That Defendants be permanently enjoined to cease and desist from violating 31 U.S.C. §§ 3729, *et seq.;*

b) That the United States be awarded damages in an amount equal to three times the damages the United States government has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

c)  That pre- and post-judgment interest be awarded;

d)  That Relator be awarded all costs of this action, including attorneys' fees and expenses;

e)  That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d); and

f)  That this Court award such other and further relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to FED.R.CIV.P. 38, Relator demands a trial by jury of any and all issues in this action so triable by right.

Dated: September 9, 2016

Respectfully submitted,

Christopher I. Kachouroff (Va. Bar No. 44216)
chris@mck-lawyers.com
Patrick M. McSweeney (Va. Bar No. 5669)
patrick@mck-lawyers.com
Robert J. Cynkar (Va. Bar No. 23349)
rcynkar@mck-lawyers.com
McSweeney, Cynkar &
  Kachouroff, PLLC
13649 Office Place, Suite 101
Woodbridge, VA 22192
(703) 621-3300

19